IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

LARAE L. CONNER,                                      Civil No. 6:15-cv-00017-PK

                    Plaintiff,

                                                      OPINION AND ORDER

          v.


CAROLYN W. COLVIN,
Commissioner of Social Security,

                    Defendant.
_____

PAPAK, Magistrate Judge:

      Plaintiff Larae L. Conner ("Conner")  filed this action January 5, 2015, seeking judicial

review of the Commissioner of Social Security's final decision denying her applications for

Disability Insurance benefits under Title II and Supplemental Security Income under Title XVI of

the Social Security Act.   This court has jurisdiction over plaintiff's action pursuant to 42 U.S.C.

§ 405(g) and 1383(c)(3).

Conner argues that by erroneously rejecting medical evidence and her testimony regarding the extent of her impairments, the Commissioner failed properly to assess her residual functional capacity after completing step three of the five-step sequential process for analyzing a Social Security claimant's entitlement to benefits, and for that reason erred by finding Conner capable of performing work as a small products assembler, basket filler, and cleaner/maid at step five of the process.

I have considered all of the parties' briefs and all of the evidence in the administrative record. For the reasons set forth below, the Commissioner's decision is reversed and this matter is remanded for the immediate calculation and payment of benefits.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. § 404.1520(a)(4), 416.920(a)(4). At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge considers the claimant's work activity, if any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. § 404.1520(a)(4)(I), 416.920(a)(4)(I). If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found

not disabled. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b).,

416.920(a)(4)(I), 416.920(b). Otherwise, the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments.

*See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. § 404.1520(a)(4)(ii), 416,920(a)(4)(ii). An

impairment is "severe" if it significantly limits the claimant's ability to perform basic work

activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S.

at 141; *see also* 20 C.F.R. § 404.1520(c), 416.920(c). The ability to perform basic work

activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §

404.1521(b), 416.921(b); *see also Bowen*, 482 U.S. at 141. If the ALJ finds that the claimant's

impairments are not severe or do not meet the duration requirement, the claimant will be found

not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c),

416.920(a)(4)(ii), 416.920(c). Nevertheless, it is well established that "the step-two inquiry is a

de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273,

1290 (9th Cir. 1996), *citing Bowen*, 482 U.S. at 153-154. "An impairment or combination of

impairments can be found 'not severe' only if the evidence establishes a slight abnormality that

has 'no more than a minimal effect on an individual[']s ability to work." *Id.*, *quoting* S.S.R. 85-

28, 1985 SSR LEXIS 19 (1985).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at

which the ALJ determines whether the claimant's impairments meet or equal "one of a number of

listed impairments that the [Commissioner] acknowledges are so severe as to preclude

substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii),

404.1520(d), 416.920(a)(4)(iii), 416.920(d). If the claimant's impairments are equivalent to one

of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416920(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, between the third and the fourth steps the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. § 404.1520(e), 416.920(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related physical and/or mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments. *See* 20 C.F.R. § 404.1545(a), 416.945(a); *see also* S.S.R. No. 96-8p, 1996 SSR LEXIS 5 (July 2, 1996).

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f). In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof shifts, for the first time, to the Commissioner.

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." S.S.R. No. 96-8p, 1996 SSR LEXIS 5 (July 2, 1996).

At the fifth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether a person with those characteristics and RFC could perform any jobs that exist in significant numbers in the national economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566, 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. If the Commissioner meets her burden to demonstrate the existence in significant numbers in the national economy of jobs capable of being performed by a person with the RFC assessed by the ALJ between the third and fourth steps of the five-step process, the claimant is found not to be disabled. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404,1520(g), 404.1560(c), 404.1566, 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. A claimant will be found entitled to benefits if the Commissioner fails to meet that burden at the fifth step. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied proper legal standards and his or her findings are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id., quoting Reddick v.*

*Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of the Commissioner. *See id.*, *citing Robbins*, 466 F.3d at 882; *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). Moreover, the court may not rely upon its own independent findings of fact in determining whether the ALJ's findings are supported by substantial evidence of record. *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003), *citing SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible [of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

## SUMMARY OF ADMINISTRATIVE RECORD[2]

Conner was 34 years old on her amended alleged onset date of August 1, 2008. Tr. 42.[3] She completed high school. Tr. 46. According to the evidence of record, prior to her claimed disability onset date Conner had substantial gainful activity as a fast food worker and home health aide. Tr. 29.

## I. The Medical Record

The medical record is extensive and the parties are familiar with it. Accordingly, it will be set out below when as necessary.

## II. The Hearing Testimony

---

[2] The following recitation constitutes a summary of the evidence contained within the Administrative Record, and does not reflect any independent finding of fact by the court.

[3] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed herein as Docket No. 8.

On June 26, 2013, a hearing was conducted before an ALJ in connection with Conner's application. Tr. 37-93. Conner, her counsel, her mother, and a vocational expert were present. Tr. 37.

## A. Conner's Testimony

Conner testified that she was 39 years old, and lives with her two children, ages 16 and 20. Tr. 43. She has no earned income, and is not taking any classes or doing any volunteer work. She completed a dialectical behavior therapy class for emotional regulation about 18 months before the hearing. Conner graduated from high school in 2008.

She last worked at Taco Bell as a line prep cook full-time for two years. Tr. 46. Her mother worked with her on the same schedule. Tr. 62. She was fired when "the lady who runs it happen to be a good family friend, so she put up with a lot of my behaviors, a lot of me walking out, and she just couldn't do it, at the end, anymore." Tr. 47. Conner testified that a family friend "ran the place, and they thought it'd be helpful if my mother came in and helped me, because my friend wanted to see me succeed, because I was newly clean. And she was quote-unquote, like, my sponsor. And so they brought in my mom." Tr. 63. Conner did not receive mental health counseling or medication while she was working. She did not believe counseling or medication would have been helpful. At the time of the hearing, she was receiving counseling, and taking medications including Xanax, Clonazepam, Propranolol, Lamotrigine, Prozac, and Metformin.

Conner worked full-time in 2001 as a nurse's aide in an assisted living facility, and as a nurse's aide in a different facility in 2002. Tr. 50. In 1998 and 1999, she was a juvenile correctional officer at MacLaren Youth Correctional Facility. She worked part-time on call.

Conner used to play games and pursue social media on the computer, but discontinued that because of her addictive behavior. Tr. 51. She isolates herself. Tr. 52. She enjoys movies and reading, but her memory is bad and it is hard for her to remember what she read the day before. She rents movies from Redbox, and her daughter brings books from the library. Her daughter usually goes with her if she leaves the house. Tr. 54. She grocery shops once a month, and her brother or mother brings her fresh produce if necessary.

Conner quit using methamphetamine six and a half or seven years before the hearing. She has not used marijuana since 2010, when she was hospitalized with a panic attack. Tr. 55. Conner testified that she takes 17 pills a day, and gets discouraged, discontinues her medications, and self-medicates with alcohol. Tr. 55. This last happened the summer before the hearing.

Conner said she cannot work because she does not want to leave her house alone. Tr. 56. She gets "overwhelmed and frustrated with the simplest task. My mind goes elsewhere, and I want to isolate. I get frustrated very easily." *Id.* She does not go out alone because she feels "more at ease when I have a support person with me, a family member." *Id.* She only goes out for appointments and shopping. Conner gets frustrated with daily activities like dishes and laundry, "I just start them, and I get frustrated and overwhelmed . . . . And I usually isolate to my bedroom." Tr. 57. Her children usually finish the chore, and Conner takes medication which makes her drowsy and she goes to sleep. Her son does most of the laundry. She can persist on a chore like washing dishes for 15 to 20 minutes before it becomes overwhelming. Tr. 58.

Conner testified that her medication causes side effects including drowsiness and dizziness, and her anti-anxiety medication "knocks me out, basically." Tr. 59. She usually gets up around 3:00 p.m., and is back in bed by 9:00 p.m. Conner continues to have anger outbursts

in social situations, like grocery shopping. She can shop for about 45 minutes before she gets hot, her vision blurs, she is unable to focus, and she yells and screams. Tr. 60. Her anxiety is provoked by loud noises and crowds, and she becomes aggressive. She was escorted out of Walmart by security when she had a confrontation with another customer in the check out line. Tr. 65.

Conner checks her Facebook account about once a week. Tr. 64. At the time of the hearing, she had been offline for about a year. She quit using the computer because she thought it was addictive. Before she quit using the computer she would be on the computer five to seven hours a day. Tr. 64.

### B. Lay Testimony

Conner's mother, Betty Conner, testified that she sees her daughter every day. Tr. 67. She usually "check[s] up on her in the morning and usually in the afternoon. Tr. 68. She believes Conner cannot work because of "[h]er inability to stay on task, her anxiety." *Id.* "We're always having to check to make sure things are done. She's – I go about once a week and make sure the house is good and clean. She tries, but she – she just gets off task, and sleeps, and goes to bed." *Id.* Conner does not finish the laundry and dishes, and her mother cleans out the refridgerator. Betty Conner attends her grandchildrens' appointments and school meetings. Tr. 69. She insures there is food in the house and clean clothes. Conner cannot attend her childrens' school events because she gets anxious and becomes emotional and irate. *Id.* Conner cries and says inappropriate things. Conner gets angry with her mother as well, when she feels that her mother is trying to direct her or is being nosy. Tr. 70. Conner's mother checks Conner's paperwork because "it doesn't get done half the time," because Conner "forgets it, absolutely forgets it." *Id.*

Conner has memory problems, has to be reminded to bathe, and becomes anxious if she has to make a decision.

Betty Conner testified that her daughter has up and down days, with down days about four days a week. Tr. 72. She worked with her daughter at Taco Bell where she calmed her daughter down two or three times a day. Conner would get overwhelmed and "nasty." Tr. 73. Betty Conner thought her daughter had worked a couple of months, part time, when the elder Conner was asked to help manage the store. She continued to work after her daughter was fired. Tr. 75-76.

On July 11, 2013, the ALJ issued a decision finding Plaintiff not disabled. Tr. 18-30. Conner requested review of the ALJ's decision, Tr. 13-14, and the Appeals Council denied her request on October 31, 2014. Tr. 1-4. In consequence, the ALJ's decision became the Administration's final order for purposes of judicial review. *See* 20 C.F.R. § 422.210(a); *see also, e.g., Sims v. Apfel*, 530 U.S. 103, 107 (2000). This action followed.

## SUMMARY OF ALJ FINDINGS

At the first step of the five-step sequential evaluation process, the Administrative Law Judge found that Conner did not engage in substantial gainful activity at any time following her amended claimed disability onset date of August 1, 2008. Tr. 20. The ALJ found Conner's date last insured was December 31, 2011. She therefore proceeded to the second step of the analysis.

At the second step, the ALJ found that Conner's impairments of personality disorder, affective disorder, anxiety disorder, obesity, asthma, and sleep disorder were "severe" for purposes of the Act. *Id.* Because an impairment was deemed severe, the ALJ proceeded to the third step of the analysis.

At the third step, the ALJ found that none of Conner's impairments was the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1. Tr. 21. The ALJ therefore properly conducted an assessment of Conner's residual functional capacity. Specifically, the ALJ found Conner had the capacity to perform light work, except she could stand and walk for six hours and sit for six hours in an eight hour workday. Tr. 23. She could never climb ladders, ropes, or scaffolds, but could frequently stoop or crouch. She could occasionally kneel. She should avoid concentrated exposure to pulmonary irritants, such as fumes, odors, dusts, gases, and poor ventilation. Conner could perform simple, relative unskilled tasks. She could work around coworkers but should have only superficial interactions with the public and coworkers.

At the fourth step of the five-step process, the ALJ found that Conner was unable to return to past relevant work as a fast food worker and home health aide. Tr. 29. The ALJ relied on the testimony of a Vocational Expert (VE) that an individual with the RFC set out above could perform other work, including small products assembler, basket filler, and cleaner/maid. Tr. 30. On that basis, the ALJ concluded that Conner was not disabled as defined in the Act at any time between August 10, 2011, and July 11, 2013. *Id.*

## ANALYSIS

Conner argues the Administrative Law Judge improperly (1) failed to credit Conner's own testimony regarding the severity of her symptoms; (2) evaluated the medical evidence; (3) posed an erroneous hypothetical question to the VE; and (4) failed to resolve a conflict between the VE and the Dictionary of Occupational Titles. Because the first two assertions are dispositive, the court need not address the remaining arguments.

## I. Credibility

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities. *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir 1995). However, the ALJ's findings must be supported by specific, cogent reasons. *Reddick v. Chater,* 157 F.3d 715, 722 (9th Cir 1998). Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reason for rejecting the claimant's testimony must be "clear and convincing." *Id.* The ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. *Id.* The evidence upon which the ALJ relies must be substantial. *Reddick,* 157 F.3d at 724. *See also Holohan v. Massinari,* 246 F.3d 1195, 1208 (9th Cir 2001). General findings (e.g., "record in general" indicates improvement) are an insufficient basis to support an adverse credibility determination. *Reddick* at 722. *See also Holohan,* 246 F.3d at 1208. The ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony. *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir 2002).

In deciding whether to accept a claimant's subjective symptom testimony, "an ALJ must perform two stages of analysis: the *Cotton* analysis and an analysis of the credibility of the claimant's testimony regarding the severity of her symptoms." [Footnote omitted.] *Smolen v. Chater,* 80 F.3d 1273, 1281 (9th Cir 1996).

> Under the *Cotton* test, a claimant who alleges disability based on subjective symptoms "must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged...." *Bunnell,* 947 F.2d at 344 (quoting 42 U.S.C. § 423 (d)(5)(A) (1988)); *Cotton,* 799 F.2d at 1407-08. The *Cotton* test imposes only two requirements on the claimant: (1) she must produce objective medical evidence of an impairment or impairments; and (2) she must

show that the impairment or combination of impairments *could reasonably be expected to* (not that it did in fact) produce some degree of symptom.

*Smolen,* 80 F.3d at 1282.

The ALJ found Conner less than fully credible as to the extent of her symptoms. Tr. 24. Conner contends that the ALJ found her less than fully credible because the ALJ found her mental health symptoms were stable with medication and therapy. An impairment that can be controlled effectively with treatment is not disabling for Social Security purposes. *Warre v. Comm'r of soc. Sec. Admin.,* 439 F.3d 1001, 1006 (9th Cir. 2006). The ALJ noted multiple instances where Conner's symptoms improved with treatment, and times when her mood was good. Tr. 24-25, 611.

The ALJ found Conner's allegations inconsistent with her daily activities. Tr. 25. A claimant's daily activities can form the basis of an adverse credibility finding when they contradict a claimant's testimony. *Molina,* 674 F.3d at 1113. Conner testified that she had anger outbursts in social situations, even when taking her medications, and she became overwhelmed at even the simplest task. Tr. 56-57, 59-60. However, as the ALJ noted, she was able to perform numerous social activities, including shopping, eating at a restaurant, going to the mall, going to church, attending family gatherings, and taking a cooking class. Tr. 25, 323, 373, 611, 627, 633, 647, 748, 757.

The ALJ found Conner's allegation of diminished cognitive ability inconsistent with the record. Plaintiff testified she became overwhelmed and frustrated with small tasks daily, and she could not persist more than 15-20 minutes on any task. Tr. 56-59. However, on examination, Conner had normal concentration and memory. Tr. 25, 486, 493, 510, 652, 680, 686. IQ testing

showed average cognitive ability. Tr. 25, 423-25. She performed normally on the trail making tests, testing for visual attention and task switching. Tr. 25, 425. Conner testified that she used to spend at lease five hours a day on the computer, and enjoyed reading books. Tr. 26, 51-53, 64. Her other daily activities, including cooking, helping with homework, managing her self care, cleaning, and laundry contradict her assertions that she could not perform the mental demands of simple work. Tr. 322-24, 371-74, 541-42, 653.

The ALJ found Conner made inconsistent statements. Tr. 26. Conner reported she took a month off from counseling to drive her son to his new job, but also said she does not drive because she cannot afford to renew her license plates. Tr. 26, 418, 420. Conner testified her mother was hired to help control her behavior, but her mother testified she was hired for other reasons. Tr. 26, 63, 72-73.

The ALJ found Conner had a tendency to exaggerate her symptoms. Tr. 26. This is a specific and convincing reason to discount a claimant's credibility. *Tonapetyan,* 242 F.3d at 1148. A personality assessment inventory suggested Conner attempted to portray herself in a negative or pathological manner in certain areas. Tr. 26, 425-26. A score on a malingering test was moderately elevated. Tr. 26, 543-44.

On this record, the ALJ identified clear and convincing reasons, supported by substantial evidence, for finding Conner less than fully credible.

## II. The Medical Evidence

Disability opinions are reserved for the Commissioner. 20 C.F.R. §§ 404.1527(e)(1); 416.927(e)(1). If no conflict arises between medical source opinions, the ALJ generally must accord greater weight to the opinion of a treating physician than that of an examining physician.

*Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual. *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007). The ALJ should also give greater weight to the opinion of an examining physician over that of a reviewing physician. *Id.* If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons. *Id.* (Treating physician); *Widmark v. Barnhart*, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician). Even if one physician is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. *Orn,* 495 F.3d at 632; *Widmark,* 454 F.3d at 1066. The opinion of a non-examining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician. *Widmark,* 454 F.3d at 1066 n. 2. The ALJ may reject physician opinions that are "brief, conclusory, and inadequately supported by clinical findings." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

## A. Caleb Burns, Ph.D.

Dr. Burns performed a psychological evaluation of Conner in September 2010. Tr. 415-28. He conducted a mental status evaluation, interview, and testing, including the Wechsler Adult Intelligence Scale-IV (WAIS-IV), portions of the Wechsler Memory Scale-III, Trail Making A and B, portions of the Wide Range Achievement Test-4, the Mood Assessment Scale, the Personality Assessment Screener and Personality Assessment Inventory. Dr. Burns concluded Conner was not employable in any work setting for the next 12 months due to her mental health issues, and would be unable to complete a normal workday without interruptions

from psychologically based symptoms. Tr. 427. Dr. Burns stated Conner would be unable to interact appropriately with the general public or accept supervision. He completed a Mental Residual Function Capacity Report in which he found Conner had numerous moderate and marked mental limitations. Tr. 429-33.

The ALJ gave Dr. Burns' opinion "little weight." The ALJ noted that Dr. Burns' opinion relied heavily on Conner's subjective complaints. Tr. 27. An ALJ is not required to accept a medical opinion based in large part upon the claimant's self-reports which the ALJ found not credible. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008). The Commissioner notes that Dr. Burns cited Conner's self-reports, including her comments that her house is messy and she avoids crowds, in support of the limitations he assessed. Tr. 431.

Conner emphasizes that Dr. Burns relied on the objective tests he administered. The Commissioner points to the fact that the results of those objective tests were generally normal. On the WAIS-IV her full scale IQ was average. Dr. Burns commented that "[o]verall she is not showing extreme deficits in the major areas assessed by this instrument." Tr. 425. On the Wechsler Memory Scale-III, Conner scored in the average range. Dr. Burns noted "she did quite well on this Auditory Immediate portion of the Wechsler Memory Scale-III." *Id.* On Trail Making Parts A and B Dr. Burns stated "[t]hese scores are quite good and they do not indicate neuropsychological deficits." *Id.* On the Wide Range Achievement Test-4, Conner's scores indicated mild deficits in reading and greater deficits in math computation, though "[o]n the whole her deficits in these areas are not extreme." *Id.* On the Personality Assessment Inventory, Dr. Burns noted Conner "achieved a valid profile but 'there are subtle suggestions that the client attempted to portray herself in a negative or pathological manner in particular areas.'" Tr. 425-

26. These normal test results support the ALJ's conclusion that Dr. Burns' opinion was based primarily on Conner's self-reports.

However, Dr. Burns observed Conner cried at least twice during the interview. Tr. 416, 419. Her gaze was avoidant through most of the interview. Tr. 423. Dr. Burns noted Conner's sentences were "quite short and often emotional." *Id.* On intake Conner was "in substantial distress and came to tears quickly about four times. There were no signs of symptom exaggeration or of malingering." *Id.* Her affect was tearful, depressed, and anxious, and her attention and concentration were impaired by her emotionality. Dr. Burns noticed that Conner became increasingly emotional during the administration of the Mood Assessment Scale. Tr. 426. He recorded that Conner was "quite volatile and quick to anger." *Id.*

An ALJ does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations. *Edlund v. Massanari,* 253 F.3d 1152, 1159 (9th Cir. 2001), *Ryan v. Comm'r of Soc. Sec.,* 528 F.3d 1194, 1199 (9th Cir. 2008). Dr. Burns clearly relied upon his own observations to reach his opinion. Therefore, the ALJ erred by rejecting Dr. Burns' opinion based on Conner's lack of credibility.

### B. Mental Health Treatment

The ALJ found Dr. Burns' opinion was inconsistent with treatment notes indicating Conner's mental health was stable and improved with treatment. Tr. 27. The ALJ cited several instances where counselors reported Conner was "stable" or improving.

Conner began mental health treatment at New Perspectives Center for Counseling and Therapy on October 2, 2009. Tr. 672. Conner began individual counseling with Belinda Pearl, L.C.S.W., M.S.G., M.A.C. On November 4, Pearl noted Conner made good eye contact and was engaged, but she sat on the edge of her seat and was tearful, highly anxious, and self-conscious. Tr. 666. On December 17, Pearl stated Conner was "stable per baseline," but was tearful with a "highly anxious affect" with worsening panic attacks. Tr. 662. The following week Pearl reported Conner was "stable per baseline," but had anger outbursts with her children and was rocking back and forth. Tr. 661.

On January 7, 2010, Conner began attending two hour long group therapy sessions with Lara Jellesed, M.A., Q.M.H.P. Tr. 660. Conner appeared anxious but participated. On January 15 Pearl reported Conner was "stable" but felt like she was getting worse. Her affect was "highly anxious." Tr. 658. The following week Conner was worse. Tr. 657. Conner met Celia Forno, P.M.H.N.P. on January 28, who described Conner as hypervigilent and anxious. Tr. 652. Nurse Forno diagnosed PTSD, Major Depressive Disorder with Anxiety, and rule-out Anxiety Disorder, and noted "anxiety so severe that pt is non-functional." *Id.*

On February 4, 2010, Pearl described Conner as angry, discouraged, and anxious. Tr. 649. Jellesed noted Conner was upset and crying. Tr. 650. The following week Pearl said Conner was "stable per baseline," made good eye contact, was engaged, but struggled not to cry. Tr. 648. On February 11 Jellesed reported Conner was practicing mindfulness while eating at a restaurant, and noted "[t]herapist is confident she is receiving some benefits from the group. . . ." Tr. 647.

On March 4, 2010, Jellesed reported Conner was not doing well after her nephew accidentally killed one of his friends. Tr. 644. The following week Pearl reported Conner was tearful with an anxious affect. Tr. 643. On March 11 Nurse Forno reported Conner felt about 20% better on Wellbutrin, had "acute PTSD," and was labile and tearful. Tr. 641. By March 22 Pearl described Conner as "stable," screened her for suicide risk, and noted she was tearful. Tr. 637. Four days later Nurse Forno increased Conner's Wellbutrin and added Vistaril for anxiety Tr. 636.

On April 1, 2010, Jellesed said Conner was a "great seller of dialectical behavior therapy." Tr. 634. One week later Jellesed recorded that Conner was proud of getting through the Easter family gathering without utilizing anti-anxiety agents. Tr. 633. In mid-April Nurse Forno recorded increased depression and hypersomnia, nightmares, and adverse medication effects of "agitation/anxiety/aggression." Tr. 629. Conner's affect was angry and agitated. A week later Jellesed reported Conner had gone to the mall for the first time in 15 years. Tr. 627. On April 22, Pearl noted Conner was "stable, having a hard time." Tr. 626.

In mid-May, 2010, Pearl noted Conner was "stable, but struggling emotionally," and made eye contact but was "highly tearful." Tr. 622. On May 14, 2010, Pearl completed a Functional Limits Assessment for the Department of Human Services Self Sufficiency Program. Tr. 414. Pearl stated that Conner could participate in the JOBS program, and was capable of participating in classroom activities including job readiness classes, but was not able to participate in job searches. Id. Pearl noted Conner could participate in work experience for five hours per week, and could participate in vocational rehabilitation "only when [patient] has achieved stable emotional regulation per mental health and related treatment goals." Id. Pearl

stated Conner would need to take emotional breaks for 10 to 15 minutes in order to achieve emotional stability.

On June 4, Pearl reported Conner had "significant anxiety" about her daughter's birthday party, as well as anxiety about saying the wrong thing in group sessions. Tr. 618. Conner was tearful and sobbing. Two weeks later Conner reported she was in a better mood. Tr. 616. On June 23, Conner said she was almost arrested at Walmart after a confrontation with a woman. Tr. 615. Her children were with her and she was embarrassed. The next day Nurse Bowling recorded that Conner had discontinued her medications, and restarted buproprion and started Seroquel. Tr. 614.

On July 8, Conner reported to Jellesed that her mood was 10/10. Tr. 611. On July 26 Pearl reported Conner was "stable/improving," she graduated from the group therapy class, was taking her medications, and not as angry. Tr. 608. Her affect was anxious, and she picked at her nails.

In mid August, 2010, Conner reported to Nurse Bowling that she was "doing bad. I got in a couple of physical altercations last week, I've just been wound, I just couldn't stop myself, I was out of control." Tr. 605. Conner said she was fine in a controlled environment but when she went out she wanted to hurt someone. Nurse Bowling noted Conner was evasive, with minimal eye contact, sat on the edge of the couch, and had rapid, pressured speech. Nurse Bowling prescribed Lorazepam and Depakoke.

In October 2010, Conner reported to Pearl high anxiety, irritability, and panic attacks. Tr. 602. Pearl noted a "highly anxious affect," and assessed "pervasive cognitive distortions about feeling like a failure." *Id.* Pearl noted Conner was stable per baseline. The following month

Pearl wrote "stable but experiencing severe physiological reactivity, had a severe panic attack, wound up in hospital." Tr. 601. Pearl noted a tearful, highly anxious affect, and assessed significant anxiety, shame and confusion. Later that month, Conner reported to Nurse Bowling daily panic attacks, anxiety at 9/10, and depression at 7/10. Tr. 599. Conner was gasping for air on the edge of the couch wringing her hands.

In December 2010, Nurse Bowling prescribed Risperdone and increased Lamotriguine. Tr. 596. A few days later, Pearl noted Conner was highly anxious, sobbing and rocking. Tr. 595. By December 13, Conner was less tearful. Tr. 594.

On January 11, 2011, Pearl noted Conner was "stable, doing okay." Tr. 591. Her affect was anxious but less so than usual, and she was less tearful than usual. By early March, Nurse Bowling noted Conner had quit using the internet because it was addictive, and rated her anxiety as 9/10, with increasing depression. Conner sat on the edge of her chair, gasping for breath. Fluoxetine was prescribed. On March 9, Conner was tearful, with depressed affect. Tr. 585. The following week Pearl described Conner as "stable but is emotionally dysregulated." Tr. 584.

In April 2011, Conner reported she stayed in bed most of the time, and she had poor hygiene. Tr. 582. She told Nurse Bowling her depression was "worse than ever." Tr. 581. By the end of the month Conner told Nurse Bowling that she was "doing awesome" since starting Abilify, she was not as angry or aggressive, and was sleeping well. Tr. 578. Pearl reported Conner was doing well in May 2011.

In June 2011 Conner was better and looking into applying to school. Tr. 573. In July Pearl described her as "stable," and Nurse Bowling noted Conner was better on Clonazepam with

anxiety "under control mostly for first time in a long time." Tr. 569. Conner was taking

Lamatrgine, Alprazolam, Clonazepam, Fluxotine, and Abilify.

On August 2, 2011, Pearl described Conner as "stable per baseline," with significant

anxiety and less tearful. Tr. 566. Through August Pearl described Conner as stable, improving,

and less anxious and tearful. Tr. 564.

On October 2, 2011, Pearl completed an Annual Update form in which she noted Major

Depressive Disorder evidenced by low mood most of the time, significant weight gain,

psychomotor retardation, fatigue, feelings of worthlessness and guilt, and trouble concentrating.

Tr. 550. Pearl cited a diagnosis of PTSD with physiological reactivity and severe avoidance of

triggers, noted Conner isolated herself, and wanted to go to school and find work but "is too

anxious to do so." *Id.* She assessed a GAF of 55. A few days later Conner reported increased

anxiety and Propranolol was prescribed. Tr. 558. She was "stable, improving," in late October

and was anxious and tearful. Tr. 556. Abilify was increased.

Through January 2012, Conner was described as improving, anxious and tearful. Tr. 764-

65. In February she was "stable per baseline," with high anxiety and tearful. Tr. 763. She was

attending church. The following month she had poor hygiene, but was less tearful. Tr. 760. In

April she reported she woke daily with panic attacks, but going to church calmed her and she did

not display her usual signs of anxiety. Tr. 757. In May 2012 Conner was "not doing well,"

staying in bed, and tearful. Tr. 756. By September her depression had increased, she was out of

medication and anxious with poor hygiene. Tr. 751. By the end of September her depression

was 7/10, anxiety was 8/10, and she was gasping for air. Tr. 750.

On October 2, 2012, Pearl completed an Annual Update form in which she noted diagnoses of Major Depressive Disorder and PTSD. Tr. 738. Pearl stated Conner wanted to go to school and work but was "too anxious to do so." *Id.* She assessed a GAF of 50. The record indicates that Pearl's assessment of Conner's mental health was that it was at best stable or with some increase of mental health symptoms over the course of her treatment. On October 11 Pearl described Conner as intensely anxious and tearful. Tr. 747.

On this record, the ALJ's determination that the treatment notes show that Conner's mental health was stable and improved with treatment is not supported by substantial evidence. The balance of the mental health evidence supports Dr. Burns' opinion.

The ALJ gave little weight to the assessed marked limitations in Conner's ability to perform daily activities and in social functioning as inconsistent with the record. Tr. 27. The ALJ notes Conner was able to grocery shop, but does not credit the evidence that she did this once a month and required family to accompany her. Tr. 323, 373. The ALJ notes Conner's hygiene and grooming were normal on examination. Tr. 27. However, the evidence is that Conner required reminders to bathe, and was often malodorous. Tr. 310, 322, 372, 582, 760, 751.

The ALJ cited Conner's participation in group therapy sessions as evidence of her ability to function socially, contradicting Dr. Burns' opinion that Conner would have a marked limitation in the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. Conner's ability to participate in weekly two hour group therapy sessions does not contradict Dr. Burns' opinion that she would be unable to sustain that ability to get along for eight hours a day, five days a week.

The ALJ failed to identify clear and convincing, or specific and legitimate, reasons to reject the opinion of the examining physician. The ALJ erred in rejecting Dr. Burn's opinion and the ALJ's decision is not supported by substantial evidence.

The evidence shows that Conner's suffers from major depression, PTSD, and anxiety disorder causing marked limitations in numerous areas of mental functioning. Tr. 430, 414. The ALJ erred by failing to include the limitations arising from Conner's mental impairments into the residual functional capacity assessment at step four. Because the ALJ excluded mental health functional limitations, the RFC determination was not supported by substantial evidence.

## REMAND

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel,* 211 F.3d 172, 1178 (9th Cir. 2000), *cert. denied,* 531 U.S. 1038 (2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Strauss v. Comm'r,* 635 F.3d 1135, 1138-39 (9th Cir. 2011)(quoting *Benecke v. Barnhart,* 379 F.3d 587, 593 (9th Cir. 2004)). The court may not award benefits punitively, and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the Act. *Id* at 1138.

Under the "credit-as-true" doctrine, evidence should be credited and an immediate award of benefits directed where: (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be

required to find the claimant disabled were such evidence credited. *Id.* The "credit-as-true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. *Connett v. Barnhart,* 340 F.3d 871, 876 (citing *Bunnell v. Sullivan,* 947 F.2d 871 (9th Cir. 2003)(en banc)). The reviewing court should decline to credit testimony when "outstanding issues" remain. *Luna v. Astrue,* 623 F.3d 1032, 1035 (9th Cir. 2010).

The ALJ's failure to credit the opinion of the examining physician is erroneous for the reasons set out above. The Vocational Expert testified that, if Dr. Burn's opinion is credited, Conner would be unable to maintain employment. Tr. 86-90.

Accordingly, this matter is remanded for the calculation and award of benefits.

IT IS SO ORDERED.

DATED this 29th day of February, 2016.

Honorable Paul Papak
United States Magistrate Judge